

# IN THE
# TENTH COURT OF APPEALS

### No. 10-16-00321-CV

## IN THE INTEREST OF K.C., A CHILD

**From the 66th District Court
Hill County, Texas
Trial Court No. 52259**

## MEMORANDUM  OPINION

The trial court signed an order terminating the parental rights of B.W., the father of eight-year-old K.C., after a bench trial.[1]  The trial court found that B.W. had violated Family Code subsections 161.001(b)(1)(E), (N), (O), and (Q) and that termination was in the child's best interest.  In his sole issue, B.W. contends that the evidence is legally and factually insufficient to establish that terminating his parental rights was in the child's best interest.  We will affirm.

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements:

---

[1] The underlying suit involved three children, K.C. and two-year-old twins.  The parental rights of F.C., the mother of the children, and M.S., the father of the twins, were also terminated, but neither has appealed.

(1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West Supp. 2016); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.2d at 25.

The following evidence was presented at trial. B.W. was charged by indictment of the second-degree-felony offense of burglary of a habitation. The offense occurred on May 21, 2013. The indictment further charged B.W. as a habitual offender. The jury found B.W. guilty and assessed his punishment at life imprisonment. B.W.'s sentence was imposed on May 1, 2014. The trial court admitted into evidence a certified copy of the judgment of conviction. The trial court also admitted into evidence a certified copy of this Court's memorandum opinion, issued on October 29, 2015, affirming the judgment of conviction.

Department of Family and Protective Services conservatorship worker Camie Staas testified that in November 2014, the Department received a referral, alleging that the children were being neglectfully supervised by their mother. The referral alleged that F.C. was arrested for criminal trespassing. She had taken the children to a vacant home with no electricity and was in the bathroom smoking marijuana with another person.

One of the twins was found crying nonstop, he had a cough, and his diaper appeared that it needed to be changed.

Staas stated that she spoke with F.C. in December 2014. According to Staas, F.C. stated that

> she was on probation for a falsified report to a police officer and that she was there cleaning the residence and that the landlord shut the electricity off on her, telling her she had to leave within 15 minutes and that she did know that the gentleman . . . who[m] she was with was arrested for possession of marijuana.

Staas also spoke with M.S. during the investigation. M.S. was in the Hill County Jail because he had violated his probation by testing positive for methamphetamines. Neither F.C. nor M.S. was aware of the other's drug use, and, according to Staas, neither F.C. nor M.S. was in a position to provide a safe home for the children.

Staas testified that the Department determined that there was reason to believe that F.C. was neglectfully supervising the children due to her testing positive for methamphetamines and marijuana and her providing unstable living conditions. The Department also determined that there was reason to believe that M.S. was neglectfully supervising the children because he had been found to be using methamphetamines and was providing unstable living conditions. Staas further said that neither F.C. nor M.S. ever did anything that indicated that they were in a position to have the children returned to them.

Staas stated that she never spoke with B.W. during her investigation. F.C. was claiming that M.S. was the father of all three children, and Staas did not become aware that B.W. was K.C.'s father until sometime in January 2015. Staas did not attempt to

contact B.W. at that point because the case had been turned over to another caseworker. There were no reports against B.W. or any indication that B.W. was a problem regarding the children at that time.

Department of Family and Protective Services conservatorship specialist Maya Carter testified that the Department was granted temporary managing conservatorship of the children on February 19, 2015. Carter believed that she sent her first of two letters to B.W. around that time. She sent B.W. the Narcotics Anonymous packet and the parenting packet that the Department sends to parents that are incarcerated. While she did not provide B.W. with K.C.'s mailing address, she provided B.W. with her own mailing address, as well as self-addressed return envelopes. Carter also met with B.W. once when he was at the Hill County Jail appealing his criminal conviction in 2016. At that time, Carter brought B.W. up-to-date on this case. Although she did not provide B.W. with K.C.'s mailing address, she told him who was caring for the children.

Carter testified that B.W. has done nothing to better the life of K.C. Although she acknowledged that B.W. may have worked services that she might not have been aware of, Carter asserted that, to her knowledge, B.W. has not done anything on the service plan. Carter further stated that B.W. has not visited with K.C., B.W. has not made any sort of contact with K.C., and he did not request that she pass on any information to K.C. B.W. is not in a position to provide an adequate, safe home for K.C., according to Carter. B.W. has been convicted of a crime and will be in prison for over two years from the date that the petition in this case was filed.

Carter testified that K.C. has been placed along with his siblings with his maternal grandmother. The Department's permanency plan for the children is relative adoption, which would require termination of the parental rights of all of the parents. It is Carter's belief that termination of the parents' parental rights would be in the children's best interest; it would allow the children to be adopted and to achieve permanency. When asked if B.W. had given her the names of anyone who might be a possible placement for the children, Carter replied that she did not recall. She said that when she contacted B.W., she would have asked him that question and that it was "possible that [she] would have followed up on it."

Hill County court-appointed special advocate (CASA) supervisor Patricia Harrison testified that she was appointed to this case in early 2016. Having seen the children throughout the duration of the case, she believes that the children are best suited in the placement with their maternal grandmother; "[t]hey have made a home there with her." Harrison stated that she had visited with the children separately and together to make sure that they had adjusted, and she believes that it is in the children's best interest to remain in the maternal grandmother's care and to be adopted by her.

Harrison testified that no CASA attempted to contact B.W. Harrison agreed that CASA was not even aware of B.W.'s existence when they first became involved because F.C. had been deceptive. Harrison further agreed that it was a fair statement that if F.C. had been more forthcoming about whom K.C.'s father was earlier in the case, then B.W. would have had more time to work services or do whatever was necessary to show that he wanted to be involved in K.C.'s life. Harrison stated that she understood that B.W.

was asking to be allowed to stay in K.C.'s life until he is released from prison "[b]ut [that] . . . it's best for this child, based on therapy and psychological evaluation of this child, to have a permanent and a safe environment that he can call home and know that that's his home, and the earlier we can do that for him, the better for the child."

B.W. testified that K.C. was born in 2008 but that he was not sure that K.C. was his son until it was confirmed by a paternity test in 2010. When asked if he was given visitation rights with K.C. after paternity was confirmed, B.W. replied that he saw K.C. "from time to time" when F.C. needed something done. B.W. stated that he would ask to see K.C. but that his relationship with F.C. was strained. F.C. made it difficult at times for B.W. to see K.C., and she never allowed B.W. to keep K.C. overnight. When asked what kind of things B.W. would do with his son, B.W. replied that they would "go shopping or something like that."

When asked if he could tell if F.C. was using drugs during that time, B.W. replied that "it was pretty much covered up until right before I got locked up." F.C. then started picking her face and losing weight. She went from being herself to being "a zombie." When asked if he did anything to get K.C. away from F.C. at that time, B.W. replied that K.C. was staying with his maternal grandmother then. B.W. further explained that he was incarcerated when the incident occurred that resulted in the removal of K.C. from F.C.

B.W. stated that he was arrested in May 2013. He bonded out on April 8, 2014, and did see K.C. during that time when he was not confined. He was then convicted and has been incarcerated since May 2014. B.W. testified that he made child support payments

until "[r]ight before I got locked up" but that he was always behind. When asked if he was a "little bit behind" when he was incarcerated, B.W. replied, "I was more tha[n] a little bit. I mean, $10,000 plus."

B.W. testified that he first met Carter in May 2016. She told him that she would send him self-addressed envelopes, but the mail was not accepted at the unit where he was incarcerated, and he did not receive those envelopes. He did receive envelopes from a woman who was working the case before Carter, and he wrote to her and let her know that he wanted to remain in K.C.'s life. He also wrote to K.C. When asked if he received a parenting service plan with a list of services that he should work, B.W. replied that they did send him "the AA and the anger management or whatever." B.W. stated, however, that he had only recently been promoted to the custody level where he could participate in those type of classes.

B.W. testified that he loves K.C. and wants to stay involved in his life. When asked why, B.W. replied that although he respects K.C.'s maternal grandmother, F.C.'s family is very dysfunctional. B.W. stated that "it's like they're handicapping my child" because K.C. still "sucks a bottle" and wets the bed. When asked if he also has some concerns about K.C.'s maternal grandmother allowing continued contact between F.C. and K.C., B.W. said that F.C. was staying with the children "right now." B.W. also stated that after F.C.'s parental rights had been terminated,[2] she had "kidnapped" the children. According to B.W., F.C. was arrested in possession of the children and charged with

---

[2] The trial court had signed an interlocutory order of termination terminating F.C.'s parental rights after F.C. signed an affidavit of voluntary relinquishment of her parental rights to the Department.

unauthorized use of a motor vehicle. B.W. nevertheless testified that he would like K.C.'s maternal grandmother to be given temporary custody of K.C. until his appeal process is definite. Although his direct appeal is over, B.W.'s current attorney is working on his habeas corpus application. B.W. stated that if he is not successful in overturning his conviction, he is eligible for mandatory supervision, and his release date is June 2019.

When asked what he has done over K.C.'s lifetime to improve his life, B.W. replied that he tried to be involved in K.C.'s life as much as F.C. would let him. When asked if he could list one thing that he has done to help K.C., B.W. responded, "I've done a lot to help [K.C.]. Financially, I mean." B.W. said that he has done a lot that was not court ordered. When asked what he has done to help K.C.'s moral development, B.W. replied, "Sir, I am not able to help [K.C.] develop anything at this time because I'm incarcerated." B.W. said that if released from prison, however, he is prepared to step up and be a father to his son. If released, he is willing and able to support K.C. emotionally, financially, and morally.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not

exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* at 372. The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable, permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

*The Desires of the Child*—There is no evidence in the record of K.C.'s desires.

*The Emotional and Physical Needs of the Child Now and in the Future and the Emotional and Physical Danger to the Child Now and in the Future*—B.W. argues that the record fails to address K.C.'s physical needs and fails to mention any physical or emotional danger to K.C. We disagree.

Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). A parent's history, admissions, drug abuse, and inability to maintain a lifestyle free from arrests and incarcerations are relevant to the best-interest determination. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). A parent's engaging in criminal conduct endangers the emotional well-being of a child because of the parent's resulting

incarceration. *See Karl v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-03-00655-CV, 2004 WL 1573162, at *3-4 (Tex. App.—Austin Jul. 15, 2004, no pet.) (mem. op.); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").

Here, B.W. was incarcerated at the time of trial and has been sentenced to life imprisonment for his burglary conviction. B.W. stated that he is still appealing his conviction and that, if released, he is willing and able to support K.C. emotionally, financially, and morally. However, the success of B.W.'s appeal is uncertain, and B.W. testified that if he is not successful in overturning his conviction, his release date would not be until June 2019. In the meantime, B.W.'s ability to meet K.C.'s physical and emotional needs is significantly hindered. B.W. acknowledged as much when asked what he has done to help K.C.'s moral development. B.W. replied, "Sir, I am not able to help [K.C.] develop anything at this time because I'm incarcerated." B.W. also admitted that he stopped paying child support when he went to prison and that he was over $10,000 in arrears at that time.

B.W.'s incarceration also endangers the physical and emotional well-being of K.C. For instance, B.W. admitted that he observed F.C. exhibiting signs of drug abuse just before he was incarcerated. He explained that he did not intervene because K.C. was staying with his maternal grandmother at that time. But K.C. and his siblings subsequently had to be removed from F.C.'s care because she was using drugs while the children were with her. When asked if he did anything to rescue K.C. from a mother who

was using drugs, B.W. replied, "Sir, I was incarcerated when this incident with [K.C.] went down. I was not free."

On the other hand, Harrison testified that she believes that it is in K.C.'s best interest to remain in his maternal grandmother's care. Harrison stated that K.C. has adjusted and made a home with his maternal grandmother. B.W. argues that he raised "some very real concerns" about whether it is in K.C.'s best interest to be placed with his maternal grandmother. B.W. testified that although he respects K.C.'s maternal grandmother, F.C.'s family is very dysfunctional. B.W. stated that "it's like they're handicapping my child" because K.C. still "sucks a bottle" and wets the bed. B.W. also believes that F.C. is still living with the maternal grandmother even though F.C. "kidnapped" the children after her parental rights had been terminated and even though she was arrested in possession of the children and charged with unauthorized use of a motor vehicle. However, although B.W. expressed his discontent that he was never asked if he had anyone that would look after K.C., B.W. testified that he would like K.C.'s maternal grandmother to be given temporary custody of K.C. until his appeal process is definite.

*The Parental Abilities of the Individuals Seeking Custody and the Programs Available to Assist These Individuals*—B.W. argues that the record also lacks mention of his parental abilities or any programs available to assist him to promote K.C.'s best interest. We again disagree.

In reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children.

*See D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 & n.39. Here, B.W. testified that even before his incarceration, he only saw K.C. "from time to time." The only explanation that B.W. gave for not seeing K.C. more often was that F.C. made it difficult at times for him to see K.C. B.W. admitted that he stopped paying child support when he went to prison and that he was over $10,000 in arrears at that time. B.W. has also been incarcerated since May 2013, except for a period of three weeks, and B.W.'s incarceration hinders his ability to meet K.C.'s physical and emotional needs.

Carter explained that B.W. had not taken advantage of the programs available to assist him because, to her knowledge, he had not done anything on the service plan. B.W. acknowledged as much, stating that he had only recently been promoted to the custody level where he could participate in those type of classes.

On the other hand, as stated above, Harrison testified that she believes that it is in K.C.'s best interest to remain in his maternal grandmother's care. Harrison stated that K.C. has adjusted and made a home with his maternal grandmother. Again, B.W. argues that he raised "some very real concerns" about whether it is in K.C.'s best interest to be placed with his maternal grandmother. But B.W. testified that he would like K.C.'s maternal grandmother to be given temporary custody of K.C. until his appeal process is definite.

*The Plans for the Child by the Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement*—The factfinder may compare the parent's and the Department's plans for the children and consider whether the plan and expectations

of each party are realistic or weak and ill-defined. *In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. *D.O.*, 851 S.W.2d at 358. The goal of establishing a stable, permanent home for children is a compelling state interest. *Dupree*, 907 S.W.2d at 87.

The Department's plan for K.C., along with his siblings, is relative adoption. Carter testified that she believes that termination of the parents' parental rights would be in the children's best interest; it would allow the children to be adopted and to achieve permanency.

B.W. testified that he loves K.C. and wants to stay involved in his life. However, B.W. was incarcerated at the time of trial and has been sentenced to life imprisonment. B.W. further stated that if he is not successful in overturning his conviction, his release date would not be until June 2019. B.W. testified that, in the meantime, he would like K.C.'s maternal grandmother to be given temporary custody of K.C. until his appeal process is definite.

*Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship Is Not a Proper One and Any Excuse for the Acts or Omissions of the Parent*—The evidence discussed above indicates that Appellant's relationship with the children is not a proper one. Any excuses for B.W.'s acts or omissions have been discussed above.

Considering all the evidence in relation to the *Holley* factors in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of B.W.'s parental rights was in the child's best interest. Viewing all the evidence in relation to the *Holley* factors, we hold that a reasonable factfinder could have reasonably formed a firm belief or conviction that termination was in the child's best interest. The evidence is therefore legally and factually sufficient to establish that termination was in the child's best interest. We overrule B.W.'s sole issue and affirm the trial court's order of termination.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed May 3, 2017
[CV06]

